UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
EDMIR GEGA,                                         :

                   Petitioner,         :

       -against-                      :      **REPORT AND RECOMMENDATION**

ROBERT E. ERCOLE, Superintendent,    :      11 Civ. 7892 (AT)(KNF)
Green Haven Correctional Facility, and
ERIC T. SCHNEIDERMAN, New York       :
State Attorney General,
                          :
             Respondents.[1]
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE ANALISA TORRES, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

Edmir Gega ("Gega") filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C.

§ 2254, challenging his conviction for first-degree burglary, three counts of second-degree

robbery, second-degree grand larceny, first-degree unauthorized use of a motor vehicle, fourth-

degree conspiracy, third-degree criminal possession of stolen property and fifth-degree

conspiracy. He asserts that: (1) the trial court denied him due process, under the Fifth and

Fourteenth Amendments to the United States Constitution, by failing to suppress statements

---

[1] In a habeas corpus proceeding, "the proper respondent is the warden of the facility
where the prisoner is being held, not the Attorney General," and no evidence is presented that an
exception to the immediate custodian rule applies here. Rumsfeld v. Padilla, 542 U.S. 426, 435-
36, 124 S. Ct. 2711, 2718 (2004) (leaving open the question whether the Attorney General is a
proper respondent to a habeas petition filed by an alien detained pending deportation); see 28
U.S.C. § 2242. Accordingly, the proper respondent in this action is the petitioner's custodian,
the Green Haven Correctional Facility Superintendent, who, at the time of this writing, is
William Lee, and the Court will refer to only one respondent in this Report and
Recommendation.

obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966); (2) his trial counsel rendered ineffective assistance to him, when he failed to object to the trial proceeding in a county without jurisdiction over the offense and to obtain his consent before waiving objection to amending the indictment; (3) his Sixth and Fourteenth Amendment rights were violated, when he was tried in Westchester County, New York, for crimes that occurred in Rockland County, New York, and he "was denied a mistrial after all the properly indicted charges were dismissed by the trial court."  The respondent opposes the petition.

## BACKGROUND

On September 7, 2004, a rainy, cold and damp day, at about 3:00 a.m., 83-year old George Gouveia ("George"), who was confined to a wheelchair, his 82 year-old wife, Susan Gouveia ("Susan"), who suffered from Alzheimer's disease, and Joyce McGill ("McGill"), a live-in health-care aide to the Gouveias, were asleep in the Gouveias' two-story home at 11 Park Drive South, in Harrison, Westchester County, when George heard his wife scream and saw two "shadowy figures" walking in their bedroom. Both men were white, in their 20's, about five feet eight inches tall, 150-160 pounds, wearing dark clothing, black ski masks, hoods pulled over their faces and gloves.  George noticed a silver pistol on the hip of one of the men.  McGill, who also heard Susan's screams, ran toward the Gouveias' bedroom.  A man pointed "something" at her, warning her not to make a sound.  One of the men was standing over Susan with one hand over her mouth and holding a knife in his other hand.  McGill was able to calm down Susan, eventually.  One of the men demanded the combination to the Gouveias' home safe.  George denied having the combination and stated that his daughter had it.  McGill also denied having the safe's combination.  The residents of the house realized that the intruders spoke English with a foreign accent and spoke to each other in a language that sounded, to the Gouveias and McGill,

like Russian or "Czechoslovakian."

At about 3:00 a.m. on the same day, Michael Sherwood ("Sherwood"), a security guard at St. Vincent's Hospital, located at 275 North Street, in Harrison, noticed a Jeep Grand Cherokee automobile enter the hospital's parking lot adjacent to the Gouveias' property. The driver drove around the lot and onto North Street, but returned about five minutes later and parked at the far end of the lot. Sherwood approached the automobile and asked the driver if he could help him. The driver said he was waiting for his girlfriend to return from visiting her father, who suffered from chest pain. Sherwood informed the driver that visitors were not allowed at that hour and that St. Vincent's was a psychiatric hospital, not a medical facility; whereupon, he asked the driver to leave the parking lot.

Inside the Gouveias' home, one of the two intruders entered the basement where the Gouveias had two safes. The smaller safe contained about $37,000 in cash. The larger safe contained George's coin collection, gold watches and other valuables. McGill and Susan were tied up and bound with duct tape and all three occupants of the house were guarded by one of the intruders. At one point, George, who was not tied, picked up the telephone at his bedside to call the police, but the man guarding them said: "It's no use." After an hour of loud noises in the basement, the other man returned from the basement and McGill heard him call someone on his cellular telephone. Shortly after the call, just before 6:00 a.m., the two intruders left. McGill and George heard a car leaving the driveway. McGill freed herself and untied Susan, went upstairs to her bedroom and used her cellular telephone to call the police.

Harrison Police Officer Christopher Provenzano was among the first officers who responded, at about 6:30 a.m. He noticed a broken window on the side of the house and pry marks on the window. The telephone lines had been cut and the basement was in shambles. A

3

small safe was broken and empty.  The doors to the larger safe and its content had been removed.

Joan Spivak ("Joan") and David Spivak ("David") lived in a two-story home at 411 West Street, in Harrison, Westchester County.  They owned a frozen desserts factory in Connecticut and a restaurant in Yorktown, New York.  On the night of September 27, 2004, the Spivaks went to bed near midnight.  It was raining.  At about 1:20 a.m., on September 28, 2004, Joan saw three men enter their second-floor bedroom.  One man approached her, put his hand over her mouth and told her to be quiet.  Another man walked over to David's side of the bed and awakened him.  The third man stood at the foot of the bed.  All the men were white, in their 20's, dressed in black, wearing heavy black sweatshirts, black pants, baseball caps, bandannas across their faces and gloves.  The men asked the Spivaks where the safe was located; the Spivaks responded that they did not have a safe.  One of the men held a gun against Joan's cheek, asking where the safe was.  Another man struck David repeatedly on the side of his forehead with his hand, asking where the safe was.  Joan told the intruders that she had $1,300 downstairs, which she was permitted to retrieve.  She gave the money to the burglars and returned to the bedroom.  The man with the gun who remained with David while Joan was retrieving the money from the basement, spoke to him in English, but spoke to his cohorts in a language that sounded, to David, like Arabic or Russian.

One of the men guarding the Spivaks continued asking about the safe, striking David with his hand and pushing Joan down on the bed.  David handed his watches to the man.  At one point, that man lit a cigarette, told David to hold out his hand and burned David's hand with the lit cigarette, then flushed the cigarette down the toilet.  The same man told Joan that if they did not cooperate, he would take David downstairs and break his legs, brandishing a nightstick he found underneath the bed.  David offered to take the man to his restaurant, where he had about

4

$4,000 in the safe, but the man scoffed at that amount of money.  Joan was taken to another room, where one of the men entered and struck the side of her face and ear with a flashlight.  After that, she was returned to the couple's bedroom.  One of the burglars, who guarded the Spivaks most of the time, took them to another room of the house, and had them sit on the floor, while he lay on the bed and spoke to David.  He talked about September 11th, saying "You know that the Jews did 9/11" and that "no Jew went to work on that day down at the towers."  Shortly thereafter, the man who was guarding the Spivaks and the largest of the men brought a pile of blue rope and a knife into the room, which was used to tie up the Spivaks.  As he walked downstairs, the largest man spoke on his cellular telephone, saying "We are ready" and "How close are you?"  Joan tried to free herself, but her husband stopped her, cautioning that the men might return, which they did, to check on the Spivaks before leaving the house at some point between 4:00 a.m. and 4:30 a.m.  When they heard the porch door open and close, the Spivaks freed themselves and tried to call the police, but the telephone lines had been cut.  The Spivaks then drove to the Harrison police station.

The Spivaks returned to their home with five or six police officers.  The house was in chaos.  The burglars had pulled apart every drawer, had taken every picture off the wall, had pulled all the clothing and other possessions out of the closets and drawers and had removed the insulation from the attic.  The Spivaks' computer was smashed and part of it had been thrown into the bathroom.  The basement filing cabinets were open and their contents had been removed.  Joan's jewelry and one case and one-half of unopened liquor were gone.  The following day, Joan noticed that a large and previously unopened bottle of water in her refrigerator was half-empty.  The police secured the bottle as evidence.

Cell site information was obtained from Sprint for the hours when the Gouveia and the

Spivak burglaries were committed, revealing that communications among three cellular telephone numbers: 914-843-7726, 646-294-5162 and 347-968-0353 were occurring and that numerous short calls were made between 914-843-7726 and 347-968-0353.  Based on this information, the police secured court orders to conduct electronic surveillance on the three cellular telephone numbers.  Over a period of about two months, a team of detectives monitored the three telephones and conducted physical surveillance based on the information obtained from cellular telephone calls they intercepted.  Starting on October 18, 2004, and continuing for the next three months, Gega's co-defendant, Ened Gjelaj ("Gjelaj"), spoke to Gega numerous times about buying a Mercedes Benz automobile, splitting the money, "washing" the money at a laundromat and taking care of ceratin business during "wet weather."  On November 1, 2004, Gega told Gjelaj "Tomorrow it's rainy weather or else we'll go check out the other place today," and referred to the fact that he was "[h]ere in Yonkers."  Gjelaj instructed Gega to buy batteries for the radio and to have everything ready.

On December 4, 2004, numerous cellular telephone calls were made among Gjelaj, Gega and three other men, which included conversations about coordinating their movements and references to walkie-talkies, a scanner, lights, gloves, and a hat that Gega was buying.  On December 11, 2004, Gega met with Gjelaj and two other men in a Rockland County shopping center.  Gjelaj told Gega to switch cellular telephones with one of the men, which he did.  Thereafter, numerous calls were made to both telephones, between 6:18 p.m. and 11:30 p.m.

Ray Kramer ("Ray") and her husband, Bertram Kramer ("Bertram"), who lived at 4 Wheatstone Road, New City, Rockland County, were renovating their home.  Concerned about security during the construction, they placed two suitcases containing about $500,000 in cash in the trunk of Ray's Jaguar automobile, parked under the house's carport.  The Kramers had a safe

on the floor of Bertram's bedroom closet, in which they had $50,000 in cash.  Previously, the suitcases containing the cash had been stored in a shed, where they had been subjected to the elements and moisture.

On December 11, 2004, at approximately 8:20 p.m., Ray heard a rustling sound outside. She went outside to investigate and was accosted from behind, thrown to the ground and had her head covered with what she thought was a dirty mat used by the construction workers.  One or more people were pouncing on her and someone forcibly crossed her legs and taped them together and also taped her arms together.  Ray pleaded with her attackers to stop and asked why they were doing this and what they wanted.  Someone warned her to be quiet and threatened to hit and kill her, telling her he had a wooden bat.  The attackers dragged Ray, feet-first, into the house and left her in the hallway.  She noticed that they spoke English with accents that sounded Slavic, Albanian or Russian, and they spoke among themselves in a foreign language.  Ray was able to see that the man who was guarding her was about 20 years old and five feet eight inches tall, and was wearing a wool hat.  Altogether, three men, who were white, attacked Ray.

Two men entered the bedroom of the Kramer's house and found the safe on the floor of Bertram's closet, the combination for the safe and the keys to the Jaguar.  They emptied the safe, took the jewelry that was in the bedroom and some Tiffany pieces and left, at about 9:00 p.m. The intruders took jewelry worth about $220,000.  Ray freed herself and discovered that the telephone lines were cut and her Jaguar was missing.  While she called the police from her cellular telephone, Bertram arrived.  Their bedroom was in shambles.  A task force was established to investigate the burglary and the investigators were dispatched to find the perpetrators, based on the activities of Gjelaj's cellular telephone.

Police officers executed search warrants at the residences of Nikolin Beqi, Edward

Curanovic and Gega.  Recovered from Gega's residence, 710 Morris Park Avenue, Bronx County, New York, where he resided alone, were two cellular telephones, as well as $902 in cash, a gold chain and a money clip.  In addition, a pair of walkie-talkies, two screwdrivers, a pair of black knit gloves and an empty holster were recovered from the car registered to Gega. Gom Zizi was the subscriber of one of the telephones recovered from Gega's residence.  That telephone was assigned telephone number 646-294-5162.  Telephone number 347-968-0353 was assigned to a prepaid cellular telephone that was not recovered, had no subscriber information connected to it and could not be linked to any individual.  The subscriber of the cellular telephone assigned telephone number 914-843-7726, was Gjelaj's mother, from whose bedroom that telephone was recovered by law enforcement personnel.

On December 12, 2004, Ray's Jaguar was found.  The police recovered various items from it, including a hat and the Kramers' two money-laden suitcases.  The following day, the money, which was stained, had an odor and was in very poor condition, was counted and delivered to the Westchester County District Attorney's Office.

On December 12, 2004, when the above-noted search warrants were executed, Gega was arrested in his home.  At approximately 9:20 a.m., Investigator D'Urso ("D'Urso") read Gega his Miranda rights.  Gega was cooperative and intoxicated.  He was taken to the police barracks in Hawthorne and brought into an interview room.  Investigator Steven M. Hegarty ("Hegarty") read Gega his Miranda rights, obtained background information from him and inquired about his activities during the preceding days.  Gega did not request an attorney or assert his right to remain silent. He made several statements to Hegarty.  Later that morning, Gega was transported to the Harrison police station.

On December 13, 2004, between 11:00 p.m. and 11:30 p.m., while he fingerprinted,

photographed and took pedigree information from Gega, Harrison Police Detective Paul Harris ("Harris") complimented Gega on his girlfriend.  Gega requested a cigarette.  Harris gave Gega a cigarette and asked him what the police were like in Albania.  Gega said that "in Albania we would have shot the police."  Harris said it was good they were not in Albania and commented that the only problem with the United States was that it sticks its nose into other countries' business, which makes the world angry.  Gega said that the world was not angry at the United States but at Israelis, and that the Jews were responsible for destroying the towers [at the World Trade Center] and no Jews went to work that day.

Gega appeared in court and his bail was set at $50,000.  On December 24, 2004, a friend of Gega and Gjelaj arrived at the Westchester County Jail to post the bail with $50,000 in cash. While counting the money, Sergeant Vincent Camera ("Camera") noticed that several hundred of the bills were very old, the oldest dated from 1934.  In his 17 years of working for the Department of Corrections, Camera had only seen cash posted for bail in this amount four or five times, and he had never seen bills this old.  Camera contacted the Harrison police, who investigated the source of Gega's bail money, including contacting the Kramers.  On December 27, 2004, the Kramers examined the bail money independently in the Westchester County Jail and identified the bills as either looking like or actually being their money.  On January 14, 2005, Bertram examined the money seized from Gega's apartment and concluded that it belonged to him.

A grand jury charged Gega and his accomplices in numerous counts of an indictment, including Count 33, fourth-degree conspiracy.[2]  During a pretrial hearing, the prosecution made

---

[2] Count 33 stated:

(continued...)

9

a motion to amend the indictment, pursuant to New York Criminal Procedure Law ("CPL") §

200.70(1), to correct the omission of Westchester County from the charge of fourth-degree

conspiracy in Count 33. The prosecutor stated:

> Where it says the defendants aiding and abetting and acting in concert with each
> other and others in the town of Clarkstown, County of Rockland, State of New York,
> it should say with each other and others in the County of Westchester and in the town
> of Clarkstown, County of Rockland and State of New York and elsewhere on or
> about and between December 4th, 2005 and December 11, 2004, et cetera.

Asked if he had any objection, defense counsel responded: "No objection to that." The court

granted the motion.

A pretrial hearing was conducted concerning Gega's motion to suppress his December

13, 2004 statements to Harris. The court denied Gega's suppression motion, finding that: (a)

Gega "implicitly waived his rights by answering Investigator Hegarty's questions immediately

after the waiver questions were asked"; (b) "[t]here is no evidence that he did not want to speak

to the investigator when questioned"; (c) although "there was evidence of intoxication," Gega

was cooperative when he talked with Hegarty and "his answers were coherent"; and (d) "[t]here

is no evidence that he did not understand his rights." The court concluded that Gega's

statements to Harris "were, in all respects, voluntarily made," since "he was having a casual

conversation with Detective Harris," and "[t]here is no evidence he asked for a lawyer at any

---

[2](...continued)
THE GRAND JURY OF THE COUNTY OF WESTCHESTER, by this Indictment, accuses
ENED GJELAJ, EDMIR GEGA and NIKOLIN BEQI, of the crime of CONSPIRACY IN
THE FOURTH DEGREE, committed as follows: The defendants aiding and abetting and
acting in concert with each other and others, in the Town of Clarkstown, County of Rockland
and State of New York, on or about and between December 4, 2004 and December 11, 2004,
with intent that conduct constituting a class B and class C felony be performed, agreed with
one or more persons to engage in and caused the performance of such conduct.

time," or that "he did not want to talk to Detective Harris."

Gega's trial was held in 2006. Expert testimony showed that deoxyribonucleic acid ("DNA") recovered from the water bottle in the Spivak house matched Gjelaj's DNA, and that DNA from flakes found on the hat recovered from Ray's Jaguar matched Gega's DNA. The Spivaks testified at the trial and identified the gold chain and money clip recovered from Gega's apartment as theirs. The Kramers also testified and identified the wool hat, containing Gega's DNA, which was recovered from Ray's Jaguar, as looking like the hat worn by one of their attackers.

At the close of the prosecution's case, Gega's counsel made a motion for a trial order of dismissal. The court dismissed all counts against Gega relating to the Gouveia and Spivak burglaries, except for Counts 19 and 20, which charged criminal possession of stolen property in the third-degree, based on Gega's possession of several of the Gouveias' rare coins and the Spivaks' watch and jewelry. Gega's counsel requested that the court: (a) instruct the jury to disregard all evidence from the Gouveia and Spivak burglaries relative to Gega; and (b) strike all testimony from the trial record of the crimes alleged to have taken place at the Gouveia and Spivak residences. The court denied that motion.

The jury convicted Gega for one count of first-degree burglary, one count of second-degree burglary, three counts of second-degree robbery, one count of second-degree larceny, one count of fourth-degree criminal possession of stolen property, one count of fourth-degree conspiracy, one count of fifth-degree conspiracy and one count of first-degree unauthorized use of a vehicle. Gega was sentenced on July 18, 2006.

***Post-Trial Proceedings***

Gega filed an appeal and made a request for court-appointed counsel, which was granted.

11

Thereafter, Gega made a motion to change counsel, due to conflict of interest, and the New York State Supreme Court, Appellate Division, Second Department, granted his motion. Subsequently, the appointed counsel expired and new counsel was assigned to prosecute Gega's appeal.

On appeal, Gega made the following claims: (1) the trial court violated his rights to due process and a fair trial, when it denied his motion for an instruction to the jury that it disregard all evidence pertaining to crimes occurring at the Gouveia and Spivak residences and his concomitant request that the court strike all testimony regarding the Gouveia and Spivak burglaries; (2) his counsel rendered ineffective assistance to him; (3) Detective Harris's testimony about the statements Gega made to him should have been excluded because Gega did not waive his <u>Miranda</u> rights; (4) the evidence was legally insufficient to convict him; (5) the verdict was against the weight of the evidence; (6) the prosecutor committed misconduct during summation; (7) his sentence was excessive; and (8) the trial court erred, when it did not declare a mistrial due to juror misconduct.  The Appellate Division modified the sentence and affirmed the judgment, finding that: (a) sufficient evidence existed to establish guilt beyond a reasonable doubt; (b) the verdict was not against the weight of the evidence; (c) the record supports the trial court's determination that Gega's "statements, made 25 hours after last receiving his <u>Miranda</u> warnings, were not involuntary"; (d) Gega's right to a fair trial was not violated by the prosecutor's reference to the terrorist attacks of September 11, 2001, in summation because they were "not so inflammatory or prejudicial as to warrant reversal," and any challenge to the remaining comments is unpreserved; (e) the jury instruction denial claim was unpreserved, since the "defense counsel waived any objection by acquiescing to the charge as given"; (f) the ineffective assistance of counsel claim, based on defense counsel's recent application for

employment with the district attorney's office and counsel's failure to obtain Gega's "consent before agreeing to allow the People to amend the indictment, . . . is based on matter[s] dehors the record, and cannot be reviewed on direct appeal," and, "[t]o the extent that the claim may be reviewed, defense counsel provided meaningful representation"; and (g) the sentence imposed was not excessive.  See People v. Gega, 74 A.D.3d 1229, 1229-32, 904 N.Y.S.2d 716, 717-19 (App. Div. 2nd Dep't 2010).  The New York Court of Appeals denied leave to appeal, see People v. Gega, 15 N.Y.3d 851, 909 N.Y.S.2d 29 (2010), and Gega's request for reconsideration of that denial, see People v. Gega, 15 N.Y.3d 920, 913 N.Y.S.2d 647 (2010).  This petition followed.

### Petitioner's Contentions

Gega contends that he was denied his Fifth and Fourteenth Amendment due process rights, when the trial court failed to suppress statements obtained from him in violation of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  According to Gega, he was highly intoxicated during the two readings of the Miranda rights and he did not acknowledge understanding them or give his oral consent to waive them.  More than 25 hours later, without hearing the Miranda rights while sober, he made statements to Harris, which were introduced as circumstantial evidence of Gega's participation in the crimes charged.  Gega contends that Harris used "more subtle methods than direct questioning" to engage him in conversation, which Harris admitted at the suppression hearing, when he explained that he was aware that one of the perpetrators made an anti-Semitic remark during one of the burglaries. Gega contends that Harris's questioning was intended to obtain incriminating statements, which cannot be admitted at trial without the prior acknowledgment of the Miranda rights and a knowing, voluntary waiver of those rights.  He asserts that "the absence of a record of acknowledgment of *Miranda* rights, or the knowing, voluntary, and intelligent waiver of those

13

rights, hardly advances the burden on the State to prove beyond reasonable doubt that [Gega] waived his right to remain silent"; thus his statements to Harris should have been suppressed.

Gega asserts his counsel rendered ineffective assistance to him when he failed to: (i) object to the trial of the Rockland County burglary and robbery in Westchester County and consented to the indictment's amendment, thus allowing the trial to proceed; and (ii) obtain Gega's consent to waive any jurisdiction challenge. Gega maintains that his counsel had numerous opportunities to object, but the only time this issue was mentioned was in counsel's request that the court instruct the jury "to disregard all the evidence of the dismissed Westchester County burglaries and robberies (the Gouveia and Spivak burglaries) in considering the Rockland County burglary (the Kramer burglary)." Gega contends further that counsel failed to alert him of the defective indictment charging him with an out-of-county crime and to secure his consent to be tried in one county for a crime which occurred in another county. According to Gega, no legal strategy justifies this failure because failing to object to the jurisdiction of the court is never a sound strategic move. Since a successful objection to the court's jurisdiction would have barred his conviction, Gega asserts that he was prejudiced by his counsel's failure to object.

Gega also contends that his counsel failed to subject the prosecution's case to meaningful confrontation and adversarial testing, because the only evidence connecting Gega to "Westchester County for purposes of the Conspiracy to Commit Robbery count (the Kramer burglary in Rockland County) came in the form of cell phone interceptions which suggested that [Gega] was actually in Westchester County." Counsel made "no meaningful attack on the equivocal evidence as to [Gega's] presence in Westchester County." Gega asserts that "[t]he call in particular alleged that [he] was at the Cross-County Mall in Yonkers, New York," which "is

14

less than a mile and a half from the Bronx-Westchester border." Thus, the failure to prove that Gega was in Westchester County "means that the verdict rested upon speculation by the jury as to jurisdiction," and shows the prosecutor's failure to prove this element of the crime. Gega maintains that no conviction would result in his case "because the jury could not try the defendant for a crime that did not occur in Westchester County" and Gega was prejudiced by this error, which must be deemed "structural." Moreover, Gega did not consent to waive this "structural violation" given that "no attempt at all was made to obtain [his] consent to waive jurisdiction." Gega contends that, in light of the lack of direct evidence linking him to the Rockland robbery, his counsel's "deficient conduct only enhanced the prejudice" to him.

Gega maintains that he was denied a fair trial and due process rights under the Sixth and Fourteenth Amendments, when: (a) he was tried in Westchester County, New York, for crimes that occurred in Rockland County, New York; and (b) his motion for a mistrial was denied, "after all the properly indicted charges were dismissed by the trial court." According to Gega, "[b]ecause the trial court improperly amended the indictment to overcome a lack of jurisdiction over [him], and trial counsel failed to object to such defect and the improper attempt to cure it, this otherwise state law procedural claim in effect denied [Gega] due process." He contends that "CPL § 20.40(1)(b) provides that a county may prosecute a crime that occurs in another county if the accused conspired in the county of prosecution to commit the crime that occurred in the other county," but none of the grounds for jurisdiction to prosecute a Rockland County burglary or robbery in Westchester County can be found in the record. When the prosecutor moved to amend the indictment to include the necessary language that the defendant aided and abetted and acted in concert with others in the County of Westchester and the County of Rockland, the prosecutor "had neither legal nor factual grounds to make such a motion, and the trial court did

15

not have legal or factual grounds to grant such a motion."  Gega contends that "no amendment of the conspiracy charge against [him] was permissible because the proposed amendments were substantive and not ministerial, and thus prohibited by statute."  Moreover, no evidence sufficient to support a charge, even circumstantially, that Gega was in Westchester County during the time alleged in the conspiracy charge existed; consequently, the charge should have been dismissed either on a motion by trial counsel or by the court acting sua sponte.

***Respondent's Contentions***

The respondent contends that Gega "disagrees with the factual findings made by the state court" in connection with the motion to suppress his statements to Harris, "but does not rebut those findings by clear and convincing evidence."  Although Gega gave no answer when asked if he understood his Miranda rights, read twice to him, "he freely and without pause answered the questions that both Hegarty and Harris put to him."  The respondent asserts that the totality of the circumstances of Gega's interrogation shows that he waived his Miranda rights knowingly and voluntarily.  Furthermore, the respondent maintains that a federal court's review of the voluntariness decision, made by a state court is subject to a harmless error standard, which Gega cannot satisfy.  Moreover, according to the respondent, any prejudice to Gega was "mooted by the simple fact that the trial judge granted the motion for a trial order of dismissal as to the Spivak burglary."

The respondent contends that Gega's ineffective assistance of counsel claim, based on the ground that counsel failed to obtain Gega's consent to waive jurisdiction, is unexhausted, since the Appellate Division stated it could not review it.  Gega never sought review of this claim through a state-collateral procedure, under CPL § 440.10.  The respondent opposes any stay of this claim to afford Gega an opportunity to pursue such a collateral procedure because it

16

would impose "an undue hardship on [the respondent], attributable solely to counsel's lack of

attention to the requirements necessary to file a habeas petition."  Moreover, given that New

York law allows only one request for review by the Court of Appeals, appealing to the highest

court is no longer available to Gega.  As a consequence, a federal habeas court can deem the

claim exhausted or reach the merits of the unexhausted claim only to deny it. Alternatively, the

respondent contends that the ineffective assistance of counsel claim, based on Gega's lack of

consent to amending the indictment to include Westchester County in the Count 33, is meritless,

because no sworn statement by Gega establishing that he did not consent to amending the

indictment was provided, and "the decision to amend the indictment was an issue that did not

require [Gega's] consent."  According to the respondent, the prosecution "made a motion during

the pre-trial hearing to amend count 33 of the indictment to fix a 'typographical error'" because

that Count "mistakenly only listed the town of Clarkstown, County of Rockland," and "to

include the locale of Westchester County, noting that such an administrative change was

'consistent with the grand jury testimony.'"  The respondent asserts that, "[u]nderstandably,

given the facts and the clear typographical error, defense counsel had no objection."  The

respondent asserts that amending the indictment "falls squarely within the confines of [CPL] §

200.70, as it deals with an error in naming the place of the crime, did not change the theory of

the prosecution's case, and, as the prosecutor noted, was 'consistent with the grand jury

testimony.'"  Thus, "[a]n administrative change to correct a typographical error in the indictment

is not a decision which requires a petitioner's consent."

     The respondent contends that Gega's ineffective assistance of counsel claim, based on

the grounds that his counsel: (i) failed to object to the trial court's lack of jurisdiction over the

offense; and (ii) consented to amending the indictment, have been rejected by the Appellate

Division.  He asserts that "counsel cannot be faulted for failing to object to the amendment of the indictment to correct a typographical error."  The respondent maintains that the record shows that Gega was in Yonkers, Westchester County, when he had telephone conversations with Gjelaj, who instructed him to buy batteries for the radio and have everything ready, on November 1, 2004, and when Gega told Gjelaj, on December 4, 2004, that he and others were waiting for Gjelaj at the Cross County Shopping Center in Yonkers.

The respondent contends that Gega's claim that his due process rights were violated, because he was tried improperly in Westchester County, for crimes committed in Rockland County, is unexhausted.  According to the respondent, this is so because, although raised on direct appeal as part of the ineffective assistance of counsel claim, the due process claim was never raised before the state court as a separate substantive claim.  Given that Gega no longer has a remedy he can exhaust in the state court, the court should deem the due process claim exhausted, but dismiss it as procedurally defaulted.  Alternatively, the claim is meritless, since the amendment made to the indictment was ministerial, and Gega's "conviction for the Rockland County burglary was entirely proper since the conspiracy took place in Westchester County."

The respondent asserts that Gega's claim, that his due process rights were violated "when he was denied a mistrial after all the properly indicted charges were dismissed by the trial court," is not addressed in Gega's petition.  In any event, according to the respondent, Gega's claim that he was denied a mistrial improperly is factually incorrect because his counsel "never asked for a mistrial after the court dismissed many, but not all, of the charges against [Gega] involving the Gouveia and Spivak burglaries."  Gega's counsel requested that the court instruct the jury to disregard all evidence pertaining to crimes occurring at the Gouveia and Spivak residences and also asked the court to strike all testimony regarding the two burglaries; the court declined to do

18

so and counsel neither objected nor requested a mistrial based on that decision.  Since Gega

never moved for a mistrial or objected to the court's jury instruction, his claim could not be

considered.  Moreover, the Appellate Division rejected this claim as unpreserved, noting that

defense counsel waived any objection by acquiescing to the jury instruction as given.

Alternatively, this claim is meritless because the request to strike all the testimony against Gega

relative to the Gouveia and Spivak burglaries "could not be accommodated by the court since

that evidence was necessary to establish [the criminal possession of stolen property] charges,"

and the court instructed the jury "that certain counts relating to the Gouveia and Spivak

burglaries were no longer to be considered against [Gega] but only against his co-defendant,

Gjelaj."

***Petitioner's Reply***

No timely reply was submitted by Gega.  Letters, submitted by Gega's counsel and Gega

after the deadline for the reply expired, cannot be considered by the Court because Gega neither

requested nor received an enlargement of the reply deadline.

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant
to the judgment of a State court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings unless the adjudication of
the claim — (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or (2) resulted in a decision that was based on
an unreasonable determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d).

"'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172 (2003).  A state-court decision is contrary to clearly established Supreme Court precedent if its conclusion on a question of law is "opposite to that reached by [the Supreme] Court," or if the state court reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000).  A state-court decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407, 120 S. Ct. at 1520.  On a petition for a writ of federal habeas corpus, "[t]he petitioner carries the burden of proof." Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).  "[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  "AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, __, 130 S. Ct. 1855, 1862 (2010) (internal citations and quotation marks omitted).

AEDPA requires a petitioner to exhaust all remedies available in the state courts.  See 28 U.S.C. § 2254(b)(1)(A).  A state court adjudicates a constitutional claim on the merits when it: (a) disposes of the claim on substantive grounds; and (b) "reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).  No articulation of the state court's

20

reasoning for disposing of the claim is required, as long as a substantive ground is a basis for the disposition.  See id.  When a claim has not been presented to a state court for adjudication, a federal court reviewing a habeas corpus petition may deem the claim exhausted "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile."  Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).  A procedurally defaulted claim may be reviewed by a federal court only if the petitioner shows "cause for the default and prejudice, or demonstrate[s] that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)."  Id.  To establish cause for a procedural default, a petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986).  Federal habeas corpus review is foreclosed where a state court relied on procedural default as an independent and adequate state-law ground, even if the state court ruled on the merits of a federal claim in the alternative.  See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10 (1989).  "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

### *Miranda Violation Claim*

> Prior to any questioning, [a person in the custody of a law enforcement officer]  must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

> Miranda, 384 U.S. at 444, 86 S. Ct. at 1612.

The waiver must be: (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "made with a full awareness of

both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986). In determining whether "the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel," the courts conduct an "inquiry into the totality of the circumstances surrounding the interrogation." Fare v. Michael C., 442 U.S. 707, 725, 99 S. Ct. 2560, 2572 (1979). The waiver of Miranda rights may be express or implied from "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." North Carolina v. Butler, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757 (1979). "[A]n accused who wants to invoke his or her right to remain silent [must] do so unambiguously." Berghuis v. Thompkins, 560 U.S. 370, __, 130 S. Ct. 2250, 2260 (2010).

To the extent that Gega claims that the prosecution failed "to prove beyond a reasonable doubt that [he] waived his right to remain silent" and made custodial statements to the police voluntarily, his claim is based on New York law, which imposes on the prosecution the burden of establishing the voluntariness of custodial statements beyond a reasonable doubt. See People v. Huntley, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 843 (1965) (New York's Constitution "mandates a jury trial of the issue of voluntariness," and "[t]he judge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury."). This is a higher prosecutorial burden than the one clearly established by federal law. See Colorado v. Connelly, 479 U.S. 157, 168, 107 S. Ct. 515, 522 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."). Since Gega's claim regarding the voluntariness of his custodial statements is premised on New York law, it is not cognizable in a federal habeas proceeding. See 28 U.S.C.

22

2254 § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("[I]t is not

the province of a federal habeas court to reexamine state-court determinations on state-law

questions.").

      Gega does not challenge the state-court's factual findings, including that: (a) <u>Miranda</u>

rights were read to him twice before he made statements to Harris; (b) although Gega was

"intoxicated based on Investigator Hegarty's observation of a strong odor of alcohol on Gega's

breath" when <u>Miranda</u> rights were read to him, he was cooperative, quiet and coherent; (c) at no

time did Gega assert his right to remain silent or asked for an attorney; and (d) Gega engaged in

a two-minute conversation with Harris about the police in Albania, the United States' role in the

world and the world's reaction to the United States.  Gega does not dispute that the Appellate

Division applied the correct legal standard in conducting the waiver analysis, namely, the totality

of the circumstances inquiry.  He challenges the state-court's conclusion that the statements he

made to Harris were voluntary, based on the grounds that: (1) they were made 25 hours after he

received <u>Miranda</u> warnings; and (2) he was intoxicated when he was informed of his <u>Miranda</u>

rights.  However, Gega does not explain how the Appellate Division's decision finding that he

waived his <u>Miranda</u> rights is contrary to or involves an unreasonable application of clearly

established federal law.  Moreover, he points to no Supreme Court precedent which the

Appellate Division applied unreasonably or to which its conclusion, that "the defendant's

statements made 25 hours after last receiving his *Miranda* warnings, were not involuntary," was

contrary.  The state-court's decision is to be evaluated under a highly differential standard, <u>see</u>

<u>Renico</u>, 559 U.S. at __, 130 S. Ct. at 1862, and "a federal habeas court may not [grant relief]

simply because [it] concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly."  <u>Williams</u>, 529 U.S. at 411,

120 S. Ct. at 1522.  Gega failed to carry his burden of showing that the state-court's decision

concerning his <u>Miranda</u> rights violation claim was contrary to or involved unreasonable

application of clearly established federal law.  Gega does not make any claim under §

2254(d)(2).  Therefore, Gega is not entitled to federal habeas corpus relief on his <u>Miranda</u>

violation claim.

### *Ineffective Assistance of Counsel Claim*

To obtain relief on an ineffective assistance of counsel claim, a habeas petitioner must

establish that his counsel's performance was: (1) deficient, such that "in light of all the

circumstances, the identified acts or omissions were outside the wide range of professionally

competent assistance," <u>Strickland v. Washington</u>, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066

(1984); and (2) prejudicial so that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694, 104 S.

Ct. at 2068.  In assessing counsel's performance, "a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action

'might be considered sound trial strategy.'"  <u>Id.</u> at 689, 104 S. Ct. at 2065 (citation omitted).

> Establishing that a state court's application of *Strickland* was unreasonable under §
> 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d)
> are both "highly differential," and when the two apply in tandem, review is "doubly
> so.  The *Strickland* standard is a general one, so the range of reasonable applications
> is substantial.  Federal habeas courts must guard against the danger of equating
> unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When
> § 2254(d) applies, the question is not whether counsel's actions were reasonable.
> The question is whether there is any reasonable argument that counsel satisfied
> *Strickland*'s deferential standard.

<u>Harrington v. Richter,</u> __ U.S. __, 131 S. Ct. 770, 788 (2011) (internal citations omitted).

Gega's claim of ineffective assistance of counsel, on the ground that counsel failed to

24

obtain his consent before agreeing to the amendment of the indictment, is unexhausted.  This is so because it was not adjudicated on the merits, since (i) it was based on matter outside the record and the Appellate Division could not review it on appeal, and (ii) Gega did not seek its adjudication, pursuant to CPL § 440.10.  This claim cannot be deemed exhausted because a CPL § 440.10 motion can be made any time after the entry of judgment.  See CPL § 440.10(1).  Thus, since the claim of ineffective assistance of counsel, based on counsel's failure to obtain Gega's consent to amending the indictment, is unexhausted, and not procedurally barred, it cannot be reviewed by a federal habeas court.

The Appellate Division rejected, on the merits, Gega's ineffective assistance of counsel claim based on counsel's: (a) failure to object to the trial in Westchester County of the crime that occurred in Rockland County; (b) consent to amend the indictment; and (c) failure to subject the prosecution's case to a "meaningful attack on the equivocal evidence as to [Gega's] presence in Westchester County," and it found that Gega's counsel provided meaningful representation. Given that: (1) the prosecutor's motion to amend the indictment was made pursuant to CPL § 200.70, which permits an amendment to correct "defects, errors or variances from the proof relating to matters of . . . place," when the amendment "does not change the theory or the theories of the prosecution as reflected in the evidence before the grand jury which filed such indictment, or otherwise tend to prejudice the defendant on the merits," CPL § 200.70; and (2) Gega was aware that "the prosecution's theory was that the conspiracy to commit the Rockland County burglary took place in Westchester County," as the evidence before the grand jury reflected, defense counsel's failure to object and counsel's consent to such an amendment was reasonable and consistent with a sound strategy.  Gega does not contest that: (a) the amendment to the indictment was consistent with the grand jury testimony; (b) evidence existed of his

25

presence in Westchester County for the purpose of establishing the court's jurisdiction; (c) he alleged in the relevant telephone call "that [he] was at the Cross-County Mall in Yonkers"; (d) the city of Yonkers is in Westchester County; and (e) his counsel challenged the prosecution's evidence.  He contends only that counsel's  challenge to the evidence was not "meaningful." Gega's position that counsel's challenge to the prosecutor's evidence was not "meaningful," without more, is not sufficient to overcome the strong presumption that, under the circumstances, counsel's conduct falls within the wide range of reasonable professional assistance and might be considered sound trial strategy.  Since defense counsel had no ground on which to object and consented reasonably to the amendment of the indictment pursuant to CPL § 200.70, as well as challenged the prosecutor's evidence, the Appellate Division's finding that counsel provided meaningful representation was neither contrary to nor involved an unreasonable application of clearly established federal law, under 28 U.S.C. § 2254(d)(1), and granting habeas corpus relief on Gega's ineffective assistance of counsel claim is not warranted.

### *Fair Trial and Due Process Violation Claims*

Gega contends his fair trial and due process rights were violated when he was: (i) tried in Westchester County "for crimes that occurred in Rockland County"; and (ii) denied a mistrial, after the court dismissed properly indicted charges.  Gega's claim that his fair trial and due process rights were violated when he was tried in Westchester County "for crimes that occurred in Rockland County," because no "grounds for jurisdiction to prosecute a Rockland County burglary or robbery in Westchester County can be found in the record," is unexhausted because it was not adjudicated on the merits by the state court.  Given that Gega's unexhausted claim is based on facts that appear on the record and was not raised on direct appeal, it would be procedurally barred by state law and raising it in the state court at this time would be futile.  <u>See</u>

CPL § 440.10(2)(c).  Thus, this unexhausted claim may be deemed exhausted.  See Aparicio, 269 F.3d at 90.  Gega's procedurally defaulted claim may be reviewed by a federal court only if Gega shows cause for the default and prejudice resulting from the failure to review it, or demonstrates that he is actually innocent.  See id.  Gega does not contend that he is actually innocent, and he failed to establish that some objective factor external to the defense impeded his counsel's efforts to comply with the state's procedural rule.  See Murray 477 U.S. at 488, 106 S. Ct. at 2645.  Accordingly, Gega's claim that his fair trial and due process rights were violated when he was tried in Westchester County "for crimes that occurred in Rockland County," cannot be reviewed in this proceeding.

Gega contends his fair trial and due process rights were violated because "he was denied a mistrial after all the properly indicted charges were dismissed by the trial court."  However, nowhere in Gega's petition does he explain the grounds for this claim or make any contentions in its support.  The record does not demonstrate that Gega's counsel made a motion for a mistrial after the court dismissed certain charges against Gega, or that such a motion was denied. Moreover, this claim is unexhausted because it was not adjudicated by the state court, and, if raised in the state court, it would be procedurally barred by state law, since it is based on the record and was not raised on direct appeal.  See CPL § 440.10(2)(c).  Gega does not contend that he is actually innocent, and he failed to establish that some objective factor external to the defense impeded his counsel's efforts to comply with the state's procedural rule.  See Murray 477 U.S. at 488, 106 S. Ct. at 2645.  Therefore, Gega's claim that "he was denied a mistrial after all the properly indicted charges were dismissed by the trial court" cannot be reviewed in this proceeding.

## RECOMMENDATION

For the foregoing reasons, I recommend that Gega's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, 500 Pearl Street, Room 720, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Torres. *Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.* See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York          Respectfully submitted,
       June 24, 2013

                                   KEVIN NATHANIEL FOX
                                   UNITED STATES MAGISTRATE JUDGE